In 1927 a $50,000 policy of life insurance was issued on the life of Robert Metzler payable to Henry Fera (his business partner) as beneficiary. The latter paid the premium until his death (over $12,500), and after Fera's death one semi-annual installment of premium ($1,045.75) was paid by complainants — the executors and trustees under his will. Before the next premium installment came due, Metzler died, and the insurance company paid to complainants the sum of $50,216.25, being the face of the policy plus dividends accrued thereon subsequent to testator's death.
Conflicting claims (as to the proceeds of the policy) being made by the beneficiaries under Fera's will, complainants file bill for instructions.
The will gives the residuary estate to complainants, in trust, to pay annuities of $600 each to testator's two sisters; to pay the remaining income to his daughter, Theodora, for her life, and then to her children, if any; the corpus to go to the children at age twenty-one; in default of children the remainder goes to testator's brothers and sisters.
Testator's residuary estate was sufficient (exclusive of the insurance policy) to produce an annual income of some $5,200 to the life tenant (in addition to the $1,200 annually for the sisters). The daughter (life tenant) has as yet no children; the remaindermen-apparent are the brothers and sisters.
The facts are not in dispute (except in one particular — and that dispute, in the view of this court, is immaterial). Testator died June 18th, 1932. Some six days thereafter there was a conversation between the assistant trust officer of the trust company and the life tenant, in which some mention *Page 453 
was made of the life insurance policy. She says he asked her what she wanted to do about the policy; that she told him she would talk it over at home and let him know definitely. He denies any such inquiry and reply. The next day she sent a message to him, through her attorney, that "she would like to have the policy transferred to her, if possible, and kept up; and if it cannot be transferred she wants it kept up anyway." He replied to the attorney that he did not see how it would be possible for the executors to transfer the policy to her.
The next premium on the policy fell due on November 2d 1932. The assured was fifty-six years old and in very bad health. The trust company arranged to have the premium payable in semi-annual installments, and paid a semi-annual installment of $1,045.75 on November 2d — making this payment out of moneys received by them as income from the corpus in their hands. The life tenant says the trust officer told her he made this payment in accordance with her instructions; he denies any such statement.
The assured died in April, 1933, prior to any further premium due date, and the insurance company paid over the policy proceeds of $50,216.25 to the trustees. At testator's death the policy had a cash surrender value of $5,254. The trustees say they paid the premium because they believed such course to be their right and duty for the preservation of the estate and the benefit of the beneficiaries. There is no evidence that any of the remaindermen, except the one who was one of the trustees, authorized or consented to any such payment; indeed the uncontradicted testimony is that the others did not even know of the existence of the policy. The will gives to the trustees no power or authority out of the ordinary, simply the authority to invest and reinvest, and the power of sale of real estate; and no freedom from the usual limitations upon trustees in the matter of investment.
It is the contention of the life tenant that she is entitled to receive the entire proceeds of the insurance policy, less only the $5,254 cash surrender value aforesaid — that under the proofs hereinbefore mentioned she became so entitled by *Page 454 
equitable assignment from the trustees; and she counter-claims for decree to this effect. The remaindermen contend that it was the duty of the trustees to protect the trust estate and, as a part of that duty, to pay the premium for the benefit of all the beneficiaries under the will; and that the entire proceeds of the policy belong to the corpus of the estate and the life tenant is not entitled to any part thereof.
The policy of insurance was of course a capital asset of the testator's estate. That is obvious; and it is so held in In reGrattan's Estate, 78 N.J. Eq. 225 (at p. 231);78 Atl. Rep. 813. If the complainants had surrendered the policy instead of paying the premium, the cash surrender value of $5,254 received by them would have constituted corpus in their hands. This is conceded by all parties. It must needs also be conceded by all, that if the assured had died a day or two after the death of testator, the $50,000 proceeds would likewise have been corpus
in the hands of complainants. Had it not been for the payment of the premium by the complainants after the death of testator and prior to the death of the assured, no confusion or doubt could have arisen.
Under the provisions of the policy (which is in evidence), the complainants as the owners of the policy, had three alternative rights — either of which could have been exercised by them without the payment of any premium or any other cost or expense, at any time during the period between June 18th, 1932, the date of testator's death (or at least after their qualification as executors), and January 31st, 1933, to wit:
1. To surrender the policy for an immediate cash payment of $5,254.
2. To surrender the policy for a fully paid policy in the amount of $8,900 payable at the death of the assured whenever that should occur.
3. To retain the policy, in the full amount of $50,000, payable at the death of the assured if such death should occur prior to August 2d 1937.
If complainants had done nothing prior to January 31st, 1933 — had paid no further premium nor made any affirmative *Page 455 
election of any of these three alternative rights — the last one (No. 3) would automatically have enured and remained to their benefit.
It seems clear that complainants had the power and authority, in their own discretion — without the authorization or consent of, and notwithstanding any objection by, any of the beneficiaries — to choose whichever of these three alternatives they deemed best; and that whichever one they chose, the right thereby accruing became or remained a capital asset or part of the corpus of the estate.
It also seems clear that complainants had no right, without specific authorization to make any payment of any premium, under ordinary circumstances.
The payment of an additional year's premium would be the purchase of an additional capital asset — an addition to thecorpus. The right which the estate already had, in its corpus
as above shown, was the right to receive $50,000 if the assured should die prior to August 2d 1937. The additional right which the estate would acquire by the payment of another yearly premium would be the right (under the provisions of the policy) to receive $50,000 if the assured should die between August 2d 1937, and May 2d 1939 (and similarly each successive premium if paid would purchase a similar contingent right for successive additional periods of time).
The thing so purchased — the contingent right — would not be an asset producing income, nor even an asset of permanent value. It would be simply a gambling chance, precisely the same in principle as a ticket in a lottery, which might produce nothing or which might produce $50,000. Clearly, under ordinary circumstances, the trustees would have no right to invest the trust fund in such an asset without special authorization either by testator or by the beneficiaries of the trust fund; and, as has been seen, there was no such special authorization by the will, nor by the remaindermen, in the present instance.
It is urged by the remaindermen that the trustees not only had the right but the duty to make the premium payment in *Page 456 
the present case, as a matter of preserving or securing for the benefit of all the beneficiaries, the right to the eventual receipt of the $50,000. The trustees, in the pleadings, also say that they made the payment because they believed they had the right and duty to do so. The argument is not without force, particularly since the assured was well along in years and was in ill health and therefore the chances of the estate collecting the $50,000 in a short time and with the expenditure of a comparatively small amount in premiums amounted to a probability rather than a mere possibility (as the event indeed proved).
On the other hand, the validity of the argument as a legal proposition, even under these circumstances, may not be beyond question; but it need not here be decided — although it may be suggested that an application to the court before making the payment would have been the better and the safer course. The payment was made by the trustee in good faith and for the benefit of the estate. The life tenant did authorize the payment; the remaindermen, by their pleadings and argument ratify the payment. The questions to be decided therefore are, (1) to whom shall the proceeds be credited, and (2) against whom shall the premium paid be charged?
As to the first of these questions, it seems scarcely open to argument that, unless the life tenant acquired some special legal or equitable right to the contrary, the proceeds are to be credited to the corpus of the trust. They are the proceeds of an asset which was a part of that corpus, and they did not result, in whole or in part, from the payment of the premium. The trustees were entitled, without any further premium being paid, to receive the $50,000 if the assured should die, as in fact he did, prior to August, 1937.
Moreover, even if the receipt of this $50,000 had been the result of the policy being kept alive by the payment of the premium, the benefit must enure to the advantage of all thecestuis equitably, and not to the advantage of one class to the exclusion of the others. This needs no citation of authorities. Obviously, crediting the proceeds of the policy to income would benefit the life tenant only, and exclude the *Page 457 
remaindermen; while crediting the amount to corpus will benefit both life tenant and remaindermen in equitable proportion.
As to the debiting of the premium paid, it is likewise clear that that should be charged against corpus. As has already been shown, such payment is not a part of the cost of annual upkeep or preservation of income producing assets; it was the purchase price of an additional capital asset, and hence is to be paid for out of principal, not income.
The life tenant contends that she has a special right to the proceeds of the policy. The proofs utterly fail to establish any such right. Taking the few bits of conflicting testimony most strongly in her favor, there is no proof of any agreement between the trustees and herself for the sale of the policy to her (assuming that such sale could have validly been made without the assent of the remaindermen or at least the opportunity to them to participate).
Assuredly the trustees could not validly have sold her the policy, to the detriment of the other beneficiaries, for less than the cash surrender value of $5,254. She did not pay $5,254, and there is no evidence that she promised or intended or expected to pay that sum. There is no possible ground for finding any equitable assignment of the policy to her.
Taking the payment of the $1,045 premium as a payment by her personally, that is all she paid. As has already been shown, that payment purchased only a contingent right covering a periodafter August 2d 1937. Assuming that she became equitably entitled, by reason of that payment, to some special right or interest in the policy, such special right or interest could cover no more than the right to the proceeds if the assured should should die after August 2d 1937. He died long before that date, during the period covered by the rights inherent in the trustees at the testator's death and in nowise resulting from the payment of the $1,045.
The life tenant therefore has no right to the proceeds of the policy as such. Were it not for the statement by the trustees that they paid the premium in the course of what they believed their right and duty for the benefit of the trust *Page 458 
estate, and the further fact of the ratification of such payment by the remaindermen, it seems probable that she would have no right to any repayment of the amount of that premium. That payment by her would have been simply the purchase price for a lottery ticket which drew a blank.
In view, however, of the position taken by the trustees and the remaindermen — that the payment of the premium by the trustees was a justifiable payment made for the benefit of the trust estate — then that payment should be charged against the corpus
of the estate as of the date, November 2d 1932, and the income correspondingly credited for the reasons already given. *Page 459